UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| RAYMOND BIGELOW,<br>Individually and as representative<br>of all Rhode Island residents with<br>current policies of automobile insurance<br>issued by Allstate Insurance Company | :<br><br><br>: | <br><br><br><br>C.A. No. 1:08-cv-00254-S-LDA |
| vs. | : | **Class Action** |
| ALLSTATE INSURANCE COMPANY,<br>& BRAD LALIBERTE | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S OBJECTION TO DEFENDANT'S MOTION TO DISMISS**

## INTRODUCTION

Allstate's motion to dismiss is a reconfigured attempt to reargue its written submission advanced in state court in opposition to the plaintiff's motion to amend the complaint, which was granted by (Thompson J.) on June 6, 2008. As such, and for the reasons set forth herein, Allstate's motion to dismiss should be denied. Bigelow hereby respectfully submits that with limited discovery, he and the putative class he seeks to represent, will be able to establish a prima facie case of "institutional bad faith" against Allstate relative to its handling of both first and third party claims, contrary to the clear public policy of the state of Rhode Island.

**ALLSTATE'S "CLAIMS CORE REDESIGN PROGRAM" ("CCPR")**

In 1992, Allstate hired McKinsey & Co. ("McKinsey"), a global management consulting company to establish ways to "redesign" Allstate's claims-handling procedures. The "new" claims handling procedures were implemented by Allstate nationally in 1995, and "rolled out" in Rhode Island in the fall of 1998. According to the "McKinsey reports", the claims handling procedures would increase Allstate's stock price and add $700 million to Allstate's revenue. McKinsey consulted with and counseled Allstate for approximately five years, during which time, McKinsey provided Allstate management with reports and power-point presentations ("McKinsey reports.") In the case of *Geneva Hager v. Allstate Ins. Co.,* 98-CL-2482, a civil action filed in the Fayette Circuit Court in Kentucky by an Allstate policyholder alleging bad faith claims handling, some of the McKinsey reports came to light. According to a July 9, 2006 article in the *Lexington Herald-Leader,* the McKinsey reports were obtained by lawyers in several additional civil cases, but were all subject to protective orders, until a bad faith claim was asserted in New Mexico ("New Mexico litigation"). In the New Mexico litigation, the plaintiff's attorney refused to consent to a protective order. Allstate argued that the McKinsey reports were trade secrets, and appealed the trial court's findings that they did not constitute trade secrets. Allstate's appeal of the trial court's ruling was unsuccessful. Thereafter, Allstate refused to turn

over the McKinsey reports, leading to the entry of a default judgment against Allstate. Once again, Allstate appealed. In the *Hager* litigation, the judge ruled in 2001 that the McKinsey reports were not trade secrets. During the October 2007 trial in *Hager*, certain pages of the McKinsey reports were made public.

In a September 12, 2007 order entered in the case of *Dale Deer v. Allstate Ins. Co.*, Case No. 0516-CV-24031, Circuit Court of Jackson County, Missouri, Allstate failed to respond to an Order to Show Cause issued to address, in part, Allstate's prior violations of two court orders requiring responses to discovery, and was found in civil contempt of court. The court ordered Allstate to pay $25,000 per day beginning September 14, 2007 until the discovery sought was produced. (Exhibit 1) According to a July 23, 2008 report in *The Kansas City Star,* the fines imposed against Allstate for civil contempt had "grown to exceed $7 million." The *Dale Deer* case was scheduled to proceed to trial on Monday, July 28, 2008, however, according to *The Kansas City Star* piece, "the parties settled on confidential terms," after informing the trial judge that Allstate had produced the documents, including one slide titled "Good Hands or Boxing Gloves," an allusion to the insurer's "You're in good hands with Allstate" slogan.

On October 16, 2007, the Florida Office of Insurance Regulation ("FOIR") announced that it had issued subpoenas to all Allstate companies doing business in Florida to direct them to testify and produce documents

about Allstate's reinsurance program, the relationship to risk modeling companies, and insurance rating organizations. The subpoenas sought, *inter alia*, the McKinsey reports. The subpoenas were in response to Allstate's rate increase requests in Florida of up to 41.9 % following the enactment in January, 2007, by the Florida legislature requiring insurers to reduce rates charged for homeowners insurance. Florida legislatures voted in January, 2007 to double the size of the state-run catastrophe fund and sell the coverage to insurers at below-market rates. The savings from the low-cost reinsurance provided by Florida was required to be passed along to policyholders. Allstate applied to raise their rates instead, saying their estimates of rising costs offset the state subsidy. A public hearing was scheduled for January 15-16, 2008. The Florida inquiry was spurred, in part, by a July 18, 2007 report titled "The 'Good Hands' Company or a Leader in Anti-Consumer Practices? Excessive Prices and Poor Claims Practices at the Allstate Corporation" by J. Robert Hunter. ("Hunter Report.") [1] The Hunter Report made the following specific findings regarding Allstate's claims handling practices:

> In 1992, Allstate adopted the "Claims Core Process Redesign" (CCPR) System recommended by McKinsey & Company. As explained in the book "*From 'Good Hands' to Boxing Gloves*," [2] the CCPR was intended to "radically alter our whole approach to the business of claims." McKinsey saw the CCPR as a "Zero Sum Game."

---

[1] J. Robert Hunter is one of the nation's leading insurance consumer advocates and Director of Insurance for the Consumer Federation of America.
[2] Trial Guides LLC 805 SW Broadway, Suite 2720 Portland OR 97205 (800) 309-6845, www.trialguides.com

> As the key element of CCPR, Allstate uses a program known as "Colossus," sold by Computer Sciences Corporation (CSC). CSC sales literature touted Colossus as "the most powerful cost savings tool" and also suggested that, "the program will immediately reduce the size of bodily injury claims by up to 20 percent." As reported in the book from "*Good Hands to Boxing Gloves*,"… any insurer who buys a license to use Colossus is able to calibrate the amount of "savings" it wants Colossus to generate…If Colossus does not generate "savings" to meet the insurer's needs or goals, the insurer simply goes back and "adjusts" the benchmark values until Colossus produces the desired results.
>
> Programs like Collossus are designed to systematically reduce payments to policyholders without adequately examining the validity of each individual claim. The use of these programs appears to sever the promise of good faith that insurers owe their policyholders. Any increase in profits that results from arbitrarily selected reductions in claims payments cannot be considered to be legitimate. The introduction of these systems could explain part of the decline in benefits that policyholders have been receiving as a percentage of premiums paid in recent years by Allstate and later, to a lesser degree, by the insurance industry. Most, but not all, major insurance companies are now using Colossus. In most cases the purchase of the system was made by insurers following the marketing efforts of CSC, which promise significant savings in claims costs.

On November 16, 2007, FOIR denied Allstate's proposed rate increases for homeowners insurance, stating that "the rates proposed by the Allstate companies do not pass along all the savings reasonably available as a result of the expansion of the Florida Hurricane Catastrophe Fund." According to an Immediate Final Order filed January 17, 2008 by FOIR, Allstate was obligated to produce documents responsive to the FOIR subpoena by November 30, 2007. On that date, Allstate produced 27,000

pages of documents that were non-compliant to the instructions contained in the subpoena and filed 51 pages of "frivolous" objections with FOIR. Although Allstate subsequently produced additional documents in late December 2007, they were also "non-compliant" and included public documents already in the possession of FOIR.

On January 15, 2008, the first day of the scheduled hearing between Allstate and FOIR, FOIR halted its public hearing with Allstate due to a "total lack of cooperation and responsiveness" on the part of the company. Thereafter, on January 16, 2008, FOIR Commissioner Kevin McCarty announced that he intended to suspend the certificate of authority of all Allstate companies to write new insurance in Florida until they complied with the subpoena. "In view of Allstate's ongoing, blatant disregard of our subpoenas, I have little choice but to take an action that will send a clear message about how seriously I am taking this issue," said Commissioner McCarty. "Suspending their certificate of authority to write new business in our state should make my point…If Allstate is willing to pay $25,000 per day in fines to a Missouri court for its ongoing failure to provide similar documents, it's obvious to me that it will take more than a monetary sanction to get them to comply with our subpoenas." According to the January 16 FOIR press release, Allstate was to have provided all appropriate responsive documents to the subpoena at or before the January 15 hearing, but failed to

do so. On January 17, 2008, FOIR issued its Immediate Final Order prohibiting Allstate from writing new policies in Florida. Allstate wrote approximately $1.9 billion of auto insurance sales in Florida in 2006, compared to $1.7 billion in 2004.

In Florida on Friday, April 4, 2008, the District Court of Appeals, First District of Florida, upheld Florida's authority to suspend Allstate's license on the ground that its refusal to produce the McKinsey Report constituted an immediate danger to the public health, safety and welfare to its citizens.

**ALLSTATE'S "CUSTOMER SERVICE PLEDGE"**

The case now pending before this honorable Court is a consumer protection case involving insurance. While steadfastly and contemptuously defying court Orders to produce the McKinsey reports, Allstate has instituted, promoted and advertised a corporate "Customer Service Pledge," promising its "customers," among other things, to "fully explain the process, take time to answer all questions and concerns that you may have, and keep you informed throughout the process." (Exhibit 2) As evidenced by the selective pleadings attached to Allstate's motion to dismiss (see footnote #3 on p. 3 of Allstate's memorandum), Allstate has not addressed its widely acclaimed "Customer Service Pledge" in either the state Court or before this honorable Court, other than its summary conclusion; "As for the purported Customer Service Pledge, it is not part of the insurance policy." (See footnote #6 on p. 6 of Allstate's

memorandum) Bigelow maintains, individually and on behalf of the putative class that Allstate has an affirmative duty to fully and fairly honor its "Customer Service Pledge." (See Counts 2 & 3 of the Amended Complaint) Contrary to its "Customer Service Pledge, for those claimants who elect to retain counsel, (including Allstate policyholders) instead of the promised "good hands," they become subject to Allstate's "boxing gloves" treatment, with its undisclosed, deny, delay, take-it-or-leave-it, scorched the earth litigation tactics.

The CCPR program represents a fundamental repudiation of the historical fiduciary/Indemnity paradigm, replacing same with a business practice that places the interests of the corporate shareholders and executives above the interests and reasonable expectations of its premium paying policyholders. The insurance consumer contracts entered into between Allstate and its policyholders are exploitive in nature. These adhesion contracts, offered on a "take-it-or-leave-it" basis, are highly and aggressively promoted by Allstate, as offering a certain level of "peace of mind" protection to *all* Allstate "customers." In practice, however, these Allstate "customers" are being systematically cheated. According to Jeff Stempel, Professor of Law

at the University of Las Vegas, Allstate's CCPR/DOLF program constitutes "institutionalized bad faith."[3]

In July, 2006 Attorney David J. Berardinelli co-authored the aforementioned book entitled "From 'Good Hands' To Boxing Gloves," "How Allstate Changed Casualty Insurance in America." [4]

The book addresses Allstate's CCPR program with it's "just say no" philosophy of claims handling. Under the tutelage of the McKinsey & Co. marketing company, Allstate "schemed" to impose greater litigation on claimants, the court system and taxpayers. Allstate's "chisel and cheat" business practices, according to Berardinelli, radically altered the heretofore "Indemnity Principle" of casualty insurance into a "zero sum" game where Allstate "secretly adopted an *Enron-style* business strategy aimed at promoting the interests of Allstate's shareholders at the direct expense of its policyholders." Id at p. 28-29. "A key part of (McKinsey's) CCPR strategy is to deliberately provoke 'significantly higher levels of litigation' over claims through take-it-or-leave-it negotiating stands backed up by aggressive litigation tactics because litigation favors Allstate's interests. But deliberately forcing 'significantly higher levels of litigation' against its own policyholders simply to increase shareholder value is not giving equal consideration to its

---

[3] February 7, 2007 CNN interview by Anderson Cooper of Professor Jeff Stempel.

[4] See fn. 2 infra.

policyholder's interests." Id. at p. 123. Based upon public financial reports, Berardinelli estimates that Allstate has made at least $15 billion from CCPR/DOLF by fighting minor claims, which make up the bulk of payouts." Id. at p. 1.

Allstate's CCPR program directly conflicts with the clear public policy expressed by the Rhode Island Supreme Court in the case of *Skaling vs. Aetna Insurance Company*, 799 A. 2d 997. The *Skaling* Court stated; "We have made it abundantly clear that the duty of good faith and fair dealing includes an affirmative duty to engage in timely and meaningful settlement negotiations and to make offers of settlement consistent with an insurer's fiduciary duty to protect its insured from excess liability." The "appropriate inquiry" according to the *Skaling* Court "is whether there is sufficient evidence from which reasonable (minds) could conclude that in the *investigation, evaluation*, and *processing* of the claim, the insurer acted unreasonably and either knew or was conscious of the fact that its conduct was unreasonable." (Emphasis added) "One of the tests of insurer good faith is whether the insurer was reasonable in *both* its investigation of the claim and in its *settlement behavior*. (Emphasis added). In a clear pronouncement of the public policy of the state of Rhode Island, the Rhode Island Supreme Court held;

"It is the policy of this state to encourage the settlement of controversies in lieu of litigation. (See *Rhode Island Insurer's Insolvency Fund vs. Benoit*, 723 A. 2d 303, 308-309 (R.I. 1999) (insurers are under equivalent duty

to participate in *settlement negotiations for first-party and third-party claims."* (Emphasis added)

Finally, the *Skaling* Court specifically looked to the following statutory provisions of the Rhode Island "Unfair Claims Settlement Act" (R.I.G.L.§ 27-9.1-1) in further support of the state's public policy to encourage the settlement of controversies in lieu of litigation:

> "(4) Not attempting in good faith to effectuate prompt, fair, and equitable settlement of claims submitted in which liability has become reasonable (sic) clear;
>
> "(5) Compelling insureds, beneficiaries, or claimants to institute suits to recover amounts due under its policies by offering substantially less than the amounts ultimately recovered in suits brought by them;
>
> "(6) Refusing to pay claims without conducting a reasonable investigation." Section 27-9.1-4.

The state Court negligence action involving two Allstate policyholders is a textbook example of Allstate's CCPR program which continues to violate the clear public policy of the state of Rhode Island.

**FACTUAL AND PROCEDURAL BACKROUND**

On August 14, 2002, two Allstate policyholders, Mr. Raymond Bigelow (Bigelow) and Mr. Brad Laliberte (Laliberte) were involved in a car accident. By agreement, the Bigelow claim was submitted to pre-litigation statutory arbitration pursuant to R.I.G.L. § 27-10-3.1. The pre-hearing settlement offer was $8,500. The arbitration hearing before the mutually agreed upon arbitrator was held on November 16, 2004. The total judgment rendered in favor of

Bigelow was $13,970. Through counsel, Bigelow agreed to accept the award. Allstate, however, following the CCPR/DOLF[5] "*automatic rejection rule"* filed its rejection to the award.

On December 9, 2004, before filing the original two count complaint, plaintiff's counsel sent a letter to Ms. Ida Berger, senior casualty claims representative for Allstate seeking; "On behalf of my client, Mr. Raymond Bigelow, I hereby respectfully request that you provide me with any and all documentation setting forth Allstate's so-called DOLF program and how said program may affect Allstate's overall handling of this claim on behalf of your respective policyholders Ms. Paula Laliberte (the named insured on the Laliberte policy) as well as Mr. Raymond Bigelow." (Exhibit 3) Allstate refused this request and this litigation followed.

Ms. Berger was deposed on November 1, 2007. Addressing Allstate's "Customer Service Pledge," (Exhibit 2 infra) Ms. Berger agreed with the following written pledges made by corporate Allstate to *first and third-party* claimants:

"Q. (Reading directly from the Pledge) "Because you have been involved in an accident with an Allstate policyholder, we consider you *our customer* and will provide you with quality customer service. Do you agree with that?" (Emphasis added)

"A. Yes."

[5] "DOLF" is an acronym for "Defense of Litigated Files," which is part of Allstate's overall "CCPR" claims handling program.

"Q. In an effort to provide you with this quality *customer service, we promise* you the following: No. 1, we will fully explain the process, take the time to answer all questions and concerns that you may have, and keep you informed throughout the claims process." Do you agree with that? (Emphasis added)

"A. Yes." (Exhibit 4)

Despite Allstate's written and highly advertised "Customer Service Pledge" to "fully explain the process" to both first and third-party claimants, Allstate has and continues to breach this express promise to all of its insurance "customers."

On June 6, 2008, the Rhode Island Superior Court, (Thompson J.) granted plaintiff's motion to amend the complaint adding Count 3 for "Breach of Contract" relative to Allstate's "Customer Service Pledge" and Count 4 for institutional "Class Action" relief. [6] (Exhibit 5)

**JURISDICTION AND VENUE**

On July 3, 2008, Allstate filed a Notice of Removal in the United States District Court for the District of Rhode Island pursuant to the Class Action Fairness Act of 2005. (CAFA) The Notice lists the firm of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC One Financial Center Boston, Massachusetts 02111 "of counsel." Through local counsel, attorneys Kevin M.

---

[6] Plaintiff's counsel *voluntarily dismissed* the prayer for relief set forth in ¶ 29 of Count 2 of the original complaint alleging a violation of R.I.G.L. § 6-13.1-1 entitled "Deceptive Trade Practices," and summary judgment was granted in favor of Allstate relative to the remaining declaratory relief sought in Count 2. As such, and by agreement, Counts 3 & 4 of the amended complaint are now identified as Counts 2 & 3 respectively.

McGinty, Esq. and Nancy D. Adams, Esq. have filed entries of appearance, "pro hac vice."

**AMOUNT IN CONTROVERSY**

In reliance upon the allegations of the amended complaint, Allstate seeks Federal Court Jurisdiction over a putative class consisting of 79,402 Allstate policyholders, thus satisfying the requirement of 100 putative class members. As to the amount in controversy, Allstate relies upon ¶ 49 (b) (12) of the amended complaint. "The return premium for 79, 402 policyholders exceeds the $5,000,000 threshold." (Notice at p. 3) In measuring the amount in controversy, a court must assume that the allegations of the complaint are true and that a jury will return a verdict for the plaintiff on all claims made in the complaint. (*Kenneth Rothschild Trust vs. Morgan Stanley Dean Witter,* 199 F. Supp. 2ds 993, 1001 (C. D. Cal. 2002.)

**STANDARD OF REVIEW**
**Rule 12(b)(6)**

Dismissal under Rule 12 (b) (6) of the Federal Rules of Civil Procedure is disfavored and a motion to dismiss under the rule is rarely granted. *Lowrey v. Texas A & M University System*, 117 F. 3d 242, 247 (5th Cir. 1997). Traditionally, dismissal was not proper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Lowrey*, 117 F. 3d at 247, citing *Conley v. Gibson*, 355 U.S. 41, 45-46, 78

S. Ct. 2 L. Ed 2d 80 (1957.) In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007), the Supreme Court clarified the standard of pleading that a plaintiff must meet in order to survive a motion to dismiss under Rule 12 (b) (6). The Court noted that "Federal Rule of Civil Procedure 8 (a) (2) requires only a 'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the …claim is and the grounds upon which it rests." Id at 1965 (quoting *Conley vs. Gibson*, 355 U.S. 41, 78 S. Ct 99, 2 L. Ed 2d 80 (1957). The Court stated that there was no "probability requirement at the pleading stage," but something beyond…mere possibility…must be alleged. Id. at 1966. The facts alleged in the complaint "must be enough to raise a right to relief above the speculative level." Id. at 1965, or must be sufficient "to state a claim for relief that is plausible on its face," Id. at 1274. The Court referred to this newly clarified standard as "the plausibility standard." Id. at 1968.

On a motion to dismiss for failure to state a claim under Rule 12 (b) (6), the Court "must accept as true all of the factual allegations contained in the complaint." *Erickson vs. Pardus,* 127 S. Ct at 220; see also *Bell Atlantic* supra. The complaint "is construed liberally in the plaintiffs' favor, and (the Court should) grant plaintiffs the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Communications Corp*., 16 F. 3d 1271, 1276 (D. C. Cir. 1994).

On page 5 of its Memorandum in support of its motion to dismiss, Allstate acknowledges that "In reviewing a motion to dismiss under Rule 12 (b) (6), courts may ordinarily consider documents attached to the complaint. *Watterson v. Page,* 987 F. 2d 1, 3 (1st Cir. 1963.) In addition, courts may also consider: (i) documents the authenticity of which are not disputed by the parties; (ii) official public records; (iii) documents central to plaintiff's claim; and (iv) *documents sufficiently referred to in the complaint.*" Id. (Emphasis added)

¶39 of Count 3 of the Amended Complaint specifically and sufficiently references the aforementioned July 18, 2007 comprehensive study authored by J. Robert Hunter, Director of Insurance for the Consumer Federation of America, 1620 I Street, NW; Suite 200 Washington, D.C. 20006, entitled; "The 'Good Hands' Company or a Leader in Anti-Consumer Practices? Excessive Prices and Poor Claims Practices at the Allstate Corporation." (The summary portion of which is attached hereto as Exhibit 6). In addition to the aforementioned specific findings in the Hunter Report, Director Hunter's conclusions can be briefly summarized as follows:

1) "**Excessive rates and profits**"

> "Allstate paid out 73 percent of premium in benefits from 1987 to 1996 and a startling low 59 percent from 1997 to 2006, a decline of 19.2 percent in the value of Allstate's product to consumers."

2) "**Questionable claims settlement practices**"

> "Allstate was one of the first major insurers to adopt claims techniques designed to systematically reduce payments to

policyholders without adequately examining the validity of each individual claim, such as an automated payment system called Colossus. It adopted these techniques after being told by a consultant that these systems would put them in a "zero-sum game" with claimants, including policyholders who filed claims, in which Allstate shareholders would benefit financially at the expense of policyholders."

3) "**High consumer complaints**"

"Complaints filed against Allstate are greater than almost all of its major competitors. Many of these complaints relate to claims settlement practices consumers have perceived as unfair.

"Based on our investigation, CFA urges consumers to consider the findings of this report before purchasing or renewing home and auto insurance from Allstate. We also urge action by state insurance departments, the National Association of Insurance Commissioners and the federal government to study and correct Allstate's practices and to consider taking steps regarding insurance companies that pursue the anti-consumer practices detailed in this report."

## ARGUMENT

As set forth infra in the *Skaling* case, it is well settled that; "it is the policy of this state to encourage the settlement of controversies in lieu of litigation." The *Skaling* Court held that "insurers are under an equivalent duty to participate in *settlement negotiations* for *first-party claims and third-party claims*." (Emphasis added) Bigelow, and the putative class seek to prove that Allstate's CCPR program, with its "deny," "delay," "defend to the end" and "take-it-or-leave-it" approach to the *investigation*, *evaluation* and *processing* of first and third-

party claims, constitutes "institutionalized bad faith," as opined by Professor Stempel, and countless other lawyers, judges and legal scholars. Rhode Island's "venerable" judicial policy of encouraging the settlement of controversies was recently and strongly re-affirmed in the case of *Ryan v. Roman Catholic Bishop of Providence*, 941 A. 2d 174, decided by the Rhode Island Supreme Court on February 8, 2008; "We are keenly aware of the judiciary's obligation to see to it that litigation be not unduly or improperly prolonged." No less renowned a figure than Abraham Lincoln recognized the desirability of settlement when possible. He wrote:

> "Discourage litigation. Persuade your neighbors to compromise whenever you can. Point out to them how the nominal winner is often a real loser-in fees, expenses, and waste of time" *Abraham Lincoln, Notes for Law Lecture* (July 1, 1850), as reprinted in 2 Complete Works of Abraham Lincoln 142 (John G. Nicolay & Hays eds. 1894).

"It is very much an important part of the policy of the courts of Rhode Island (and courts in general) to encourage the amicable settlement of disputes, whether by mediation or otherwise. See, e.g., *Zarrella v. Minnesota Mutual Life Insurance Co.*, 824 A.2d 1249, 1253 n. 2 (R.I. 2003) (observing that "the parties would have been better served by mediation"); *Skaling v. Aetna Insurance Co.*, 799 A. 2d 997, 1012 (R.I. 2002) ("it is the policy of this state to encourage the settlement of controversies in lieu of litigation"); see also *United States v. Davis*, 261 F. 3d 1, 27 (1st Cir. 2001) (noting that there is a "strong public policy in favor of settlements") (internal citations omitted); *Arruda v. Sears, Roebuck* &

*Co.*, 273 B.R. 332, 345 (D.R.I.) ("In Rhode Island, courts favor the settlement of litigation disputes.") As we have previously stated:

> "Our policy is always to encourage settlement. Voluntary settlement of disputes has long been favored by the courts." *Homer, Inc. v. North Farm Associates*, 445 A. 2d 288, 290 (R.I. 1982.) Fn23)

"Our judicial system encourages settlement because it serves several laudable purposes, among them lessening the strain on scarce judicial resources and preventing litigants from sustaining significant costs. See, e.g. *LaFleur v. Shoney's Inc.*, 83 S. W. 3d 474, 478 (Ky. 2002) ("The settlement of cases serves the duel and valuable purposes of reducing the strain on scarce judicial resources and preventing the parties from incurring significant litigation costs.") see also *D.H. Overmyer Co. v. Loflin*, 440 F. 2d 1213, 1215 (5th Cir. 1971); see generally 15 A. C.J.S. Compromise and Settlement § 1 (2002)."

Rhode Island's strong public policy is also supported statutorily and in the Rhode Island Rules of Practice and Procedure. R.I.G.L. § 27-10.3-1 entitled "Arbitration Provision" mandates that "(a) Every contract of motor vehicle liability insurance, issued in the state by an insurance carrier authorized to do business in the state, shall contain the following provisions:

(1) Any person, referred to in this section as "the plaintiff," suffering a loss, allegedly resulting out of the ownership, maintenance, or use of a motor vehicle by an insured, and allegedly resulting from liability imposed by law for property damage, bodily injury, or death, may, at his or her election, whenever

the claim is for twenty-five thousand dollars ($25,000) or less, submit the matter to arbitration pursuant to chapter 3 of title 10…"

Allstate's CCPR/DOLF "*automatic rejection rule*" runs afoul of the provisions of this statute, as well as Rhode Island's mandatory court-annexed arbitration program. ("CAA") Under Rhode Island's CAA program, *all* civil actions filed in Superior Court in which there is or are claims for monetary relief not exceeding $100,000 total, exclusive of interest, costs and attorney's and District Court Appeals, are subject to Rhode Island's mandatory court-annexed arbitration program promulgated pursuant to R.I.G.L. § 8-6-5 and § 8-6-6, and approved by a Superior Court order dated March 6, 1989. Section 3 (L) entitled "Sanctions" of the Superior Court Rules governing arbitration provides that; "Any party failing or refusing to participate in an Arbitration proceeding in a good faith a meaningful manner shall be subject to sanctions by the Court on motion of a party, or report of the Arbitrator, as provided in Super. R. Civ. P. 37. Moreover, the CCPR program conflicts with a lawyer's ethical obligations pursuant to Rule 3.2 of the Supreme Court Rules of Professional Conduct, entitled "Expediting Litigation." Finally, and fundamentally, the CCPR program conflicts with the very scope and intent of Rule 1 of the Rhode Island Superior Court Rules of Civil Procedure, which states in relevant part that the rules … "shall be construed and administered to

secure the *just*, *speedy*, and *inexpensive* determination of every action." (Emphasis added).

**THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING**

In one of the first cases to recognize and define the scope of bad faith law, the California Supreme Court in the case of *Egan vs. Mutual of Omaha*, 24 Cal 3d 809, 169 Cal Rptr 691, 620 P2d 141, 445 U.S. 912, 63 L. Ed 2d 597, 100 S. Ct. 1271 explained:

> "The insurers' obligations are rooted in their status as purveyors of a vital service labeled quasi-public in nature. Suppliers of service affected with a public interest must take the public interest seriously where necessary, placing it before their interest, in maximizing gains and limiting disbursements… the obligations of good faith and fair dealing encompass qualities of decency and humanity inherent in the responsibilities of a fiduciary, and with the public trust, must go private responsibility consonant with that trust…the availability of punitive damages is thus compatible with recognition of insurers' underlying public obligations and reflects an attempt to restore balance in the contractual relationship."

The public policy considerations concerning the contractual relationship between an insured and insurer, eloquently set forth on the West Coast in the *Egan* case, are equally compelling here on the East Coast, as articulated by our Supreme Court in *Skaling*. Moreover, R.I.G.L. 9-1-33 not only addresses a carriers "bad faith" refusal to pay or settle a claim, but also provides a statutory cause of action for "an insured" (Bigelow and the putative class) who alleges that a carrier (Allstate) "*otherwise wrongfully and in bad faith refused to timely perform its obligations under the contract of insurance.*" (Emphasis added).

**ALLSTATE ADMISSIONS**
(Exhibit 7)

In 1998, Allstate implemented the "CCPR II Defense of Litigated Files" (aka DOLF) program in the State of Rhode Island. (Ad. B1) The "DOLF" program was not and is not a secret or "confidential" claims handling program. (Ad. B2) Attorney Michael J. Reed, Jr.,[7] attempted to discuss the DOLF claims handling program with the honorable presiding Justice Rodgers. (Ad. B4) Attorney Reed gave Justice Rodgers a brief outline of the DOLF claims handling program. (Ad. B5) Most notably, attorney Reed wanted to inform Justice Rodgers how the DOLF claims handling program could benefit 1) the court; 2) plaintiffs and 3) *Allstate insureds*. (Emphasis added) (Ad. B6) Despite the alleged benefits of the DOLF program on behalf of all Rhode Island premium paying Allstate policyholders, Allstate does not have a regular practice of disclosing the DOLF benefits to its insureds. (Ad. B8) Allstate does not disclose the DOLF benefits on its web site. (Ad. B9) Allstate does not disclose the DOLF benefits to its corporate sales agent staff. (Ad. B10) Allstate does not disclose the DOLF benefits to its independent sales agent(s). (Ad. B11) Allstate does not disclose the DOLF benefits in the actual insurance policy/contracts and/or endorsements. (Ad. B12) Allstate has no policy or procedure in place to disclose the DOLF benefits to its policyholders. (Ad. B14) Allstate has no plan, policy, program and/or protocol

[7] Head of so-called "house counsel" for Allstate

to disclose the DOLF benefits to Rhode Island Allstate policyholders. (Ad. B15)

Allstate's CCPR/DOLF program is analogous to the "Performance, Planning and Review" ("PP&R") claims handling program that was the subject matter of the United States Supreme Court decision in *State Farm Mutual Automobile Insurance Company vs. Campbell et al,* 538 U.S. 408 (2003). Mr. Curtis Campbell had a policy of automobile insurance issued by State Farm, with per person liability limits of $25,000 and an aggregate limit of $50,000. In 1981, Mr. Campbell was involved in an accident in which one person was killed and another permanently disabled. Although investigators concluded that Mr. Campbell caused the collision, his insurer, State Farm, contested liability and took the case to trial. The two plaintiff's offered to settle their respective claims for the policy limit of $50,000 ($25,000 per claimant). State Farm ignored the advice of one of its own investigators and took the case to trial, assuring the Campbells that "their assets were safe, that they had no liability for the accident, that (State Farm) would represent their interests, and that they did not need to procure separate counsel." A jury determined that Mr. Campbell was 100% at fault for the collision and a judgment was entered for $185,849. At first State Farm refused to cover the $135,849 in excess liability. Counsel for State Farm made this clear to the Campbells: "You may want to put for sale signs on your property to get things moving." Campbell

obtained his own counsel to appeal the verdict. During the pendency of the appeal, the plaintiffs and the Campbells agreed to an assignment of Campbell's bad faith action against State Farm. In 1989, the Utah Supreme Court denied Campbell's appeal in the wrongful death and tort actions. In response, State Farm paid the entire judgment, including the amounts in excess of the policy limits. *Thereafter*, the Campbells filed a complaint against State Farm alleging bad faith, fraud, and intentional infliction of emotional distress. The trial court initially granted State Farm's Motion for Summary Judgment because State Farm had paid the excess verdict, but that ruling was reversed on appeal. In the first part of the ensuing trial, the jury found State Farm's decision not to settle *unreasonable*. The second phase of the trial addressed State Farm's liability for fraud and intentional infliction of emotional distress, as well as compensatory and punitive damages. The Utah Supreme Court characterized this phase of the trial as follows:

> "State Farm argued during phase II that its decision to take the case to trial was an 'honest mistake' that did not warrant punitive damages. In contrast, the Campbells introduced evidence that State Farm's decision to take the case to trial was a result of a *national scheme* to meet corporate fiscal goals by capping payouts in claims company world wide. This scheme was referred to as State Farm's 'Performance, Planning and Review,' or PP&R, policy." (Emphasis Added)

The jury awarded the Campbells $2.6 million in compensatory damages and $145 million in punitive damages, which the trial court reduced to $1 million and $25 million respectively. Both parties appealed and the Utah Supreme

Court reinstated the $145 million punitive damages award. In a 6-3 opinion, the United States Supreme Court overturned the punitive damages award, finding the 45-1 ratio between the compensatory and punitive awards to be in violation of the due process clause. The Court acknowledged, however, that a punitive damage award with a "single-digit" ratio "will satisfy due process." Most notably in the *Campbell* case, an award of $1 million dollars in compensatory damages was sustained for State Farm's "*unlawful scheme*"…to deny benefits owed to consumers by paying out less than fair value in order to meet preset, arbitrary payout targets designed to enhance corporate profits." That policy, according to the trial judge, was encompassing in scope; it "applied equally to the handling of both *third-party and first-party claims*." (Emphasis added)

It appears beyond dispute that the Utah trial judge, the Campbell jury, the Utah Supreme Court, and at least three members of the United States Supreme Court, were appalled by State Farm's non-transparent, "unlawful scheme." A reading of the *Skaling* decision strongly suggests that our Supreme Court would be equally appalled by Allstate's non-transparent claims handling scheme, (CCPR/DOLF) which directly conflicts with its expressly promised "Customer Service Pledge."

When buying an Allstate policy, policyholders are led to believe that they are buying security from loss and "peace of mind" as well as the much

acclaimed "good hands" treatment in the event of a first or third-party claim. Most "customers" would never buy or renew an Allstate policy if they knew beforehand that Allstate intended to give them "boxing gloves" treatment should they ever try to obtain the full benefits of their policies. These "customers" would be outraged to learn that in buying Allstate Insurance they were actually signing up to be pawns in Allstate's master strategy to win the "zero sum" economic game for the benefit of Allstate's shareholders and executives. Allstate's CCPR claims handling scheme clearly is contrary to the public policy considerations expressed by the Rhode Island Supreme Court in the *Skaling* case and its progeny. Moreover, the program places Allstate's corporate profits above its fiduciary duties and obligations to its premium paying policyholders. The time, efforts and legal expenses paid by Allstate to avoid disclosing the CCPR program to its policyholders is astounding. A negligence case involving two Allstate policyholders that could have been amicably resolved for the sum of $13,970.00, ($5,470 above Allstate's "take-it-or-leave-it" $8,500 settlement offer) as a result of the November 17, 2004 pre-litigation, statutory arbitration before a mutually agreed upon arbitrator is now pending in Federal Court, and being defended by premier counsel from Rhode Island and Boston.

## CONCLUSION

Allstate's controversial CCPR program has generated a wave of litigation. State attorney generals, state bar associations, and private individuals have filed lawsuits against Allstate across the country alleging that these practices are fraudulent, deceptive, confusing and illegal. For example, in the case of *Eunice Wells, et al vs. Allstate*, Civil Action No. 00-0760-LFO, the honorable Justice Louis F. Oberdorfer, sitting in the United States District Court for the District of Columbia, certified a "consumer class" on August 12, 2002, consisting of approximately 1,200 Allstate policyholders residing in the District of Columbia, for "delay" damages to policyholders who retained counsel to advance their respective uninsured motorist claims. *Wells* argued, inter alia, that Allstate *failed to disclose* that it resisted paying on uninsured motorist claims, and that it adopted a "scorched earth litigation" tactic against policyholders who litigated after refusing to settle. Like the case at bar, Allstate removed the *Wells* case to Federal Court. In a "Memorandum" filed on August 12, 2002, in support of the certification Order, the honorable Justice Oberdorfer made reference to the following specific class action allegations made by Eunice Wells individually and as putative class representative:

"The complaint alleges that Allstate *did not disclose* material facts about its claims handling processes, specifically that Allstate:

- "has not divulged to the purchasing public" that it engages "in a course of action designed to specifically deny and/or delay timely uninsured motorist benefits." Am Compl. ¶ 3.

- "did not inform plaintiff, and others similarly situated…that (they) would be required to retain counsel and fully litigate (their) claim(s) to a likely trial before a jury in order to collect benefits." Id. ¶ 4.

- "failed to advise the plaintiff, and other(s) similarly situated,… that Allstate Insurance Company… ha(s)…a corporate policy in effect (of) often extending low offers of settlement and if claimant insists that he/she is being treated unfairly and refuses to accept same, it adopts a 'scorched earth litigation tactic.'" Id. ¶ 11

In May, 2008, the *Eunice* Class Action case against Allstate settled for the sum of $800,000. (Exhibit 8).

As stated at the outset of this memorandum, by removing this case to Federal Court, and with the filing of its motion to dismiss, Allstate is seeking to essentially retool its written and oral arguments made in support of its objection to the plaintiff's motion to amend the complaint. As evidenced by the state Court "Civil Docket Sheet" (Exhibit 9), Allstate's memorandum of law in support of its objection to the plaintiff's motion to amend was filed on May 12, 2008. Justice Thompson thereafter entertained oral arguments on May 19, 2008 and June 6, 2008, respectively, before granting the plaintiff's

motion to amend the complaint. As stated infra, Allstate has completely failed to address its "Customer Service Pledge" and the reasons why the carrier has intentionally and systematically refused to honor its expressed promise to "*fully explain the process*" to *first and third-party* "customers," such as Bigelow.

Since 1998 in the state of Rhode Island, Allstate's CCPR program has caused considerable backlog in the civil jury trial calendar, while completely disregarding the state's clear public policy. Moreover, the CCPR program is contrary to Rhode Island statutory law and Rules of Practice and Procedure. All Rhode Island Allstate "customers" (and all Rhode Island taxpayers as well) have suffered and will continue to suffer economic and other damages to be proven at trial, as a result of the "boxing gloves" treatment secretly implemented by Allstate. While aggressively mounting its "Customer Service Pledge" campaign, Allstate has engaged in a decade of deceit, disinformation, and dishonesty with its delay, deny and defend to the end approach to the handling of first and third party claims.

This suit represents an important step for Allstate "customers" in the state of Rhode Island, in the battle of profits and corporate greed over people. Settling claims should not be a "zero sum game" of low ball and hard ball; rather claims should be *investigated, negotiated* and *processed*, fairly and in good faith, and the carrier's "*settlement behavior"* must be reasonable. (See *Skaling* infra) The non-confidential McKinsey reports that will be sought on behalf of

Bigelow and the putative class, will establish a prima facie case that Allstate's systematic "*settlement behavior*" scheme is unreasonable as a matter of law and public policy.

WHEREFORE, Bigelow and the putative class, hereby respectfully request that Allstate's motion to dismiss be denied.

Raymond Bigelow, et al
By plaintiff's attorney,

/s/ Dennis D. Bossian, Esq.

Dennis D. Bossian, Esq. #3674
231 Quaker Lane
West Warwick, RI 02893
(401) 828-5463 Ph
(401) 828-5974 Fax

**CERTIFICATION**

I, Dennis D. Bossian, Esq., hereby certify that a true and accurate copy of the foregoing Memorandum of Law in Objection to the Motion to Dismiss filed by Allstate Insurance Company has been furnished this__27__day of August, 2008 by United States Mail, postage pre-paid, to:

Paul S.Callaghan, Esq.
Higgins, Cavanagh & Cooney, LLP
123 Dyer Street
Providence, RI 02903

Kevin M. McGinity, Eq.
Nancy D. Adams, Esq.
One Financial Center
Boston Massachusetts, 02111

Dated: August___27__,2008

/s/Dennis D. Bossian, Esq.
Dennis D. Bossian, Esq.