# I. EXECUTIVE SUMMARY

In recent years, property-casualty insurers have made a number of significant but not always highly visible changes in the way they assess risk, set rates and manage claims. The aftermath of Hurricane Katrina exposed the harmful effects of many of these changes on policyholders, especially lower income and minority consumers.

These alarming trends have been apparent for more than a decade. Over time, property-casualty insurers overall have paid out less in claims for every dollar spent on premiums by consumers, as profits and overhead costs increased. Many insurers have implemented pricing "innovations" like using credit scores and multiple rate classifications that appear to have a disparate, adverse impact on poorer and minority consumers. They have changed policy language to hollow out the coverage offered, particularly for home insurance, and dramatically increased consumers' out-of-pocket costs. They have deployed ambiguous and harmful coverage restrictions that are beyond-the ability of consumers to clearly understand. Some insurers have also refused to renew the policies of consumers in coastal regions, forcing them into high-cost state-supported insurance pools. This practice socializes the cost of high risks while privatizing the profitable risks.

As CFA has tracked these questionable practices, one insurance company stood out as a leader in creating and exploiting many of these trends. That insurer is Allstate. As a result, CFA launched a detailed investigation of Allstate's business practices, which found:

1. **Excessive rates and profits,** compared to the low level of claims that Allstate has paid out to consumers. From 1987 to 1996, property-casualty insurers overall paid out 70 percent of premiums as benefits. From 1997 to 2006, the payout was only 65 percent, a decline of 7.1 percent in value to consumers for the typical insurance product. In the late 1980s and early 1990s, Allstate's insurance products were of slightly greater value per premium dollar to consumers than those of other insurers. However, the company's property-casualty products have become less valuable than the industry average in recent years. Allstate paid out 73 percent of premium in benefits from 1987 to 1996 and a startling low 59 percent from 1997 to 2006, a decline of 19.2 percent in the value of Allstate's product to consumers (see graph below).

As the consumer value of Allstate's policies has declined, their profits have increased. Allstate's profits were consistently higher than that of the overall industry during this period, averaging about 6 percent more. Allstate's current return on equity of 25.8 percent is also significantly higher than the returns it earned in the late 1980s.

Questionable claims settlement practices, resulting in unjustifiably low claims payments. Allstate was one of the first major insurers to adopt claims payment techniques designed to systematically reduce payments to policyholders without adequately examining the validity of each individual claim. such as an automated payment system called Colossus. It adopted these techniques after being told by a consultant that these systems would put them in a "zero-sum game" with claimants, including their policyholders who filed claims, in which Allstate shareholders would

**Paid Severity**




benefit financially at the expense of policyholders.

This graph, based on information produced by Allstate,' offers significant evidence of a pattern of underpayment. It shows that Allstate has consistently paid out lower claims for bodily injuries relative to the rest of the property-casualty insurance industry over more than a twenty year period. (It is indexed to 1993, which is listed as "100.") From 1993 to 1996, Allstate's paid severity dropped by 21 percent to 79, while industry-wide payments dropped to 94. Since 1996, Allstate's paid severity has slowly increased to about 98, while the industry increased to 117. Overall, Allstate reduced its payouts on these claims by almost 20 percent relative to the industry result.

Mistreatment of consumers throughout the country in the aftermath of Hurricane Katrina. Allstate has proven to be a fair weather friend for many policyholders. It has dropped coverage for hundreds in many coastal areas around the country. In 2005 and the first half of 2006, Allstate abandoned thousands of Floridians it had insured, dropping about thirty percent of its book of business in that short period of time.[2]

' May 16. 2007, Dan Hale, Chief Financial Officer of Allstate, presentation to the UBS 2007 Global Finance Services Conference (At Slide 6).

[2] Allstate's non-renewal effort at this time appears to have been more severe than the actions taken by other leading insurers.

Yet, they actually increased their market share for automobile insurance in Florida during 2006.[3] This chart[4] shows how Allstate cut policies for homes in Florida in 2005 and 2006, while increasing the number of auto policies it sold in the state.

4. **Unfair rating and underwriting practices.** Allstate has been a leader in developing complex and difficult to understand pricing systems, using credit scores and multiple rate "tiers" not clearly related to the risk of their customers. These trends make comparison shopping for consumers more difficult and appear to lead to higher rates for poorer and minority consumers.

5. **High consumer complaints**. Complaints filed against Allstate are greater than almost all of its major competitors. Many of these complaints relate to claims settlement practices consumers have perceived as unfair. According to data collected by the National Association of Insurance Commissioners, Allstate's "complaint ratio" was the second worst of thirteen major automobile insurers in 2005 and 2006 (tying with Farmers Insurance.) Allstate had the second worst complaint ratio among eight major home insurers in 2005, and the lowest ranking in 2006.

6. **Shifting costs to taxpayers**. Allstate is an industry leader in seeking taxpayer subsidies for its riskier insurance coverage, especially in Congress. In the wake of Hurricane Katrina, Allstate and other major insurers have been criticized by state officials and policyholders for underpaying claims for wind damage and shifting these costs to the flood insurance program, which is supported by tax dollars. A newspaper investigation found that Allstate might also have charged the government more for materials used to

[3] Bear Sterns June 2 1, 2007 Report on "Meetings with Management" of Allstate, shows that market share in auto insurance rose from 12.8 percent to 13.0 percent from 2005 to 2006. However, Bear Sterns warned that the reason may be linked to clever selection by Allstate of which homeowner policyholders to non-renew to keep their auto insurance portfolio growing: "Our one remaining concern is that the initial non-renewed customers were primarily mono-line homeowners, while the next batch of non-renewals will have both auto and home policies."

[4] Based upon a PowerPoint Presentation of the then Allstate CEO Edward M. Liddy to the Credit Suisse Insurance Conference, November 17, 2006, Slide 16.

repair flood damages paid for by taxpayers than Allstate pays for the same materials to repair wind damages.

Allstate is certainly not the only insurer pursuing these harmful practices, but it has been at the forefront in developing and implementing many of them. Unfortunately, many of these ''innovations" have now been adopted across the industry.

These practices do not appear to be justified by any increase in financial risk borne by property-casualty insurers. In fact, a detailed analysis of the investment performance of Allstate and other property-casualty insurers shows that they represent a below-average risk for investors, as measured by standard measures of risk for investment.

Based on our investigation, CRA urges consumers to consider the findings of this report before purchasing or renewing home and auto insurance from Allstate. We also urge action by state insurance departments, the National Association of Insurance Commissioners and the federal government to study and correct Allstate's practices and to consider taking steps regarding other insurance companies that pursue the anti-consumer practices detailed in this report.

## II. INTRODUCTION

CFA has observed several adverse trends in the property-casualty insurance industry, some of which began decades ago and some of which are new. For instance, an increase in the use of "classifications" to evaluate customer risk and set rates began many years ago, but it has accelerated in recent years through the use of credit scoring to rate policies. Claims practices have grown less consumer-friendly over the years, as the problems that many consumers encountered after Hurricane Katrina revealed. The use of computer programs such as Colossus has made it less likely that consumers will receive a settlement offer that is based on a fair and individualized assessment of their true losses. Significant coverage restrictions began after Hurricane Andrew but have become worse in recent years with the development of extreme policy restrictions like the "anti-concurrent causation clause."

In the aftermath of Hurricane Katrina, reports of consumer dissatisfaction with the insurance industry filled the newspapers in Florida and along the Gulf Coast. These reports highlighted severe claims adjustment problems, policies with unexpected coverage gaps, denials of continued coverage, limits on new underwriting of business and huge price increases. This adverse conduct toward consumers occurred despite the fact that insurers had already been through a learning curve in responding to a major weather catastrophe more than a decade earlier: Hurricane Andrew. In the wake of the mid-1990s price spikes and coverage cutbacks that occurred, as well as major policy changes that were made by states (such as the creation of state catastrophe insurance pools), insurers promised that they would not in the future cause further coverage upheavals, regardless of the frequency or severity of storms. The fact that the current wave of anti-consumer practices has occurred at a time of record insurance industry profits makes the severe and precipitous actions of some insurers even less justifiable.

The one large insurance company that has been frequently cited for a broad range of anti-consumer practices in recent years is Allstate. This might be because Allstate is a very large…